**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | |
|---|---|
| **INDIGO AG, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **CIVIL ACTION NO. 2:21-cv-02052** |
| ) | |
| **FEARLESS GRAIN MARKETING, LLC** ) | |
| **AND JEREMEY FROST,** ) | |
| ) | |
| **Defendants.** ) | |

---

### AMENDED COMPLAINT

---

Plaintiff, Indigo Ag, Inc. ("Indigo"), by and through counsel, and for its Complaint against Defendants Fearless Grain Marketing, LLC ("FGM") and Jeremey Frost states as follows:

### PARTIES

1.      Indigo is a Delaware corporation licensed and authorized to do business in the State of Tennessee with principal places of business in Boston, Massachusetts and Memphis, Tennessee.

2.      FGM is a limited liability company organized under the laws of South Dakota with a principal place of business located at 1003 S 8th Street, Onida, SD 57564.  FGM has undertaken all or most of the actions complained of in this Complaint through the actions of Jeremey Frost, both as signatory for FGM and as principal for it.

3.      Jeremey Frost is a member of FGM and, on information and belief, the owner and a self-described partner of FGM.  Jeremey Frost is a resident and citizen of South Dakota, and

upon information and belief, no other member of FGM is a resident of Tennessee, Massachusetts or Delaware.

## JURISDICTION

4.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a)(1).  There is complete diversity of citizenship between Plaintiff and Defendants, and the amount in controversy exceeds $75,000, exclusive of interests, fees and costs.

5.      This Court has personal jurisdiction over Defendants because Defendants voluntarily entered into the Master Grain Marketing Advisor Agreement, two Grain Transaction Commitment Agreements, and the Marketplace Volume Incentive Agreement and, pursuant to the express terms of each of those agreements, each signed by Frost on behalf of FGM, Defendants irrevocably consented to personal jurisdiction in Tennessee.  Personal jurisdiction over Defendants is also proper because a substantial part of the events giving rise to Plaintiff's claims against Defendants occurred in the State of Tennessee, including but not limited to Defendants' performance of contracts in Tennessee and transacting of business with Indigo personnel located in Tennessee.

6.      Venue is proper pursuant to 28 U.S.C. § 1391 as certain of the acts or omissions giving rise to this action occurred here.  Venue is additionally proper here based on the aforementioned contracts entered into between Indigo and Jeremey Frost and FGM, which provide for venue in the courts of Tennessee generally, and in some cases, in Shelby County specifically.

## BACKGROUND

7.      Indigo is an agricultural technology company that has developed plant-focused microbial technologies, formulations, and products for the treatment of seed to improve agronomic yield and quality.

2

8.      Indigo offers a digital platform to growers and buyers permitting growers and buyers to interact and transact in a grain and transportation marketplace, referred to as Indigo Marketplace, as well as a carbon credits marketplace, all in service of Indigo's stated mission to foster high-quality and sustainably produced agricultural products.

9.      In carrying out this business, Indigo utilizes grain marketing advisors ("GMA") as independent contractors to facilitate the company's efforts to make use of Indigo Marketplace and connect growers with buyers to purchase the growers' crops.

**Marketing Advisor Agreement**

10.     On or about May 1, 2019, Jeremey Frost entered into a Grain Marketing Advisor Agreement ("Marketing Advisor Agreement") with Indigo on behalf of his company, FGM.  *See* Ex. A (Marketing Advisor Agreement, effective May 1, 2019).   In the Marketing Advisor Agreement, FGM agreed to:

a.      provide "services to Indigo," including "serving as a grain marketing advisor to certain sellers of crops to facilitate crop purchase and sale transactions on… Indigo Marketplace" and "referring its network of growers to participate in Indigo Marketplace." Ex. A ¶ 2.

b.      act as "an agent for certain growers and sellers of crops ('Growers') in a role known as a 'grain marketing advisor' (a 'GMA')."   Ex. A at section entitled "Indigo Marketplace; Grain Marketing Advisor."

11.     As a result of the Marketing Advisor Agreement, Jeremey Frost, acting through his business, FGM, became a GMA in the Indigo Marketplace and agreed to "provide advice to Growers on crop marketing strategies, or act as an agent for Growers, for Indigo Marketplace transactions." *Id.*

12.     FGM acknowledged in the Marketing Advisor Agreement that it would receive Indigo Confidential Information and covenanted to keep such information confidential. FGM also

acknowledged that, by entering into the agreement, FGM does not become an agent of Indigo. Specifically, the Marketing Advisor Agreement provided that:

    a.    FGM "hereby agrees that it will hold in strict confidence and not disclose to any third party any Indigo Confidential Information… or use or exploit any Indigo Confidential Information for Advisor's benefit or for the benefit of any third party except as expressly authorized by this Agreement. Advisor will be responsible for any disclosure or mis-use of Indigo Confidential Information by its affiliates, directors, officers, employees, consultants, agents or representatives, and those of their affiliates." Ex. A at section entitled "Confidential Information."

    b.    Indigo and FGM "are independent parties and are engaged in the conduct of their own respective businesses. Indigo is not to be considered the agent of Advisor, and Advisor is not to be considered the agent of Indigo, for any purpose, and neither Party has the right or authority to enter into any contracts or assume any obligations for the other or to give any warranty to or make any representation on the other's behalf, except where and to the extent authorized specifically in writing to do so." Ex. A at section entitled "Independent Parties."

### Master Agreement

13.    On August 1, 2019, Jeremey Frost entered into a Master Grain Marketing Advisor Agreement ("Master Agreement") with Indigo on behalf of his business, FGM. *See* Ex. B (FGM Marketplace Master GMA Agreement, effective August 1, 2019). The Master Agreement provides that "[t]he following terms and conditions apply to any Indigo Marketplace transaction, including any transaction subject to a Sale Agreement, pursuant to which [FGM] ha[s] indicated that [FGM is] acting, or will act, as the agent of, and on behalf of, a Seller." *Id.*, Annex A, ¶ 2. Thus, the Master Agreement supplemented the Marketing Advisor Agreement and, to the extent the terms of the Master Agreement conflict with the Marketing Advisor Agreement, the Master Agreement controls.

14.    In entering into the Master Agreement, FGM agreed to "terms and conditions… on which [FGM] will participate in the Indigo Marketplace platform." *Id.* ¶ 1. FGM again agreed in the Master Agreement to "participate in the Indigo Marketplace… as a 'Grain Marketing Advisor' for

one or more crop growers or sellers who wish to sell their crops on the Indigo Marketplace." *Id.* at

section entitled "Your Role in Indigo Marketplace."  The Master Contract again specifies that FGM

is "an independent contractor" and that "nothing in the Master Agreement… shall make [FGM] an

employee, agent or partner of Indigo." *Id.* at section entitled "Independent Contractor."

15.     In performing that role, the Master Contract permitted FGM to conduct either

"agent transactions" or "principal transactions."

a.     An "agent transaction" is a transaction in which FGM acts as a "duly and legally
       appointed agent of a Seller," *i.e.* a commodity grower.  In those transactions, FGM
       "will enter into transactions with Indigo on behalf of such Seller and such Seller
       will be the contracting party with Indigo, and as such, Seller is solely responsible
       for completing its obligations under such transaction."

b.     A "principal transaction" is a transaction in which FGM "contract[s] directly with
       Indigo as a seller of crops."  In those transactions, FGM is the "contracting party
       with Indigo and [FGM] will be directly and solely responsible for the obligation to
       deliver the crops promised under such transaction, notwithstanding any failure to
       perform by any third party, including, without limitation, any grower that [GMA]
       source[s] crops from."

*Id.* at section entitled "Your Role in Indigo Marketplace."

16.     The Master Agreement further provided that it is FGM's "sole responsibility to

ensure that [FGM] clearly designate to Indigo (i) the nature of any Indigo Marketplace transaction

that [FGM] enter[s] into on the Indigo Marketplace, (ii) whether [FMG is] acting on behalf of a

Seller or contracting on [its] own behalf, and (iii) if [FGM is] acting on behalf of a Seller in an

Agent Transaction, to clearly identify the correct Seller." *Id.*

### Agent Transactions

17.     The Master Agreement sets forth additional terms and conditions for Agent

Transactions in Annex A.  These terms and conditions include the requirement that FGM obtain a

duly executed Marketplace Agent Authorization Form ("Authorization Form") from a seller

"[p]rior to taking any action on any Indigo Marketplace transaction on behalf of any Seller." *Id.,*

Annex A, at section entitled "Authority." If FGM obtains an Authorization Form from a seller, FGM "represent[s] and warrant[s] to Indigo that [FGM has] all power and authority necessary to enter into binding contracts for the sale of crops on behalf of such Seller." *Id.*

18.     In the Master Agreement, FGM further agrees that:

a.     "by taking any action on the Indigo Marketplace on behalf of a Seller, [FGM] represent[s] and warrant[s] at the time of such action that the Authorization Form that has been submitted with respect to such Seller is in full force and effect, and has not been revoked or otherwise terminated at the time that You take such action on behalf of the Seller." *Id.*

b.     "Indigo will act in reliance on the Authorization Form and [FGM is] under an obligation to notify Indigo of any revocation of any authorization from a Seller and to abstain from soliciting or entering into any transactions on behalf of any Seller in the absence of a valid and effective Authorization Form." *Id.*

19.     The Master Agreement anticipates that a seller may grant FGM only the limited authority to review "bids, offers, and potential transactions" on the Indigo Marketplace on the seller's behalf. *Id.* at section entitled "Limited Authority GMA." Under those circumstances, FGM "will ONLY have the authority to review potential transactions on behalf of Seller," and FGM agrees that FGM "will NOT enter into any transaction on behalf of Seller without the proper Authorization Form." *Id.* Accordingly, the Master Agreement reiterates that FGM may "only enter into a transaction on the Indigo Marketplace on behalf of a seller for which a valid Authorization Form is in effect." *Id.*

20.     With respect to transactions covered by the Master Agreement, FGM has no authority to bind Indigo. The Master Agreement contains the following provision:

"The issuance of a Fill Order by Indigo is not a binding obligation on Indigo." Rather, "[t]ransactions will only be binding on Indigo upon issuance of a Confirmation by Indigo. Neither [FGM] nor any Seller are entitled to any Confirmation, which shall be issued in Indigo's sole discretion."

*Id.* at section entitled "Transactions."

21.     The Master Agreement also provides "it is [FGM's] responsibility to inform the Seller of all information for the full performance contemplated by the Sale Agreement. Indigo will rely on [FGM] regarding any notice, or lack of notice, contemplated by the Sale Agreement, and reserves the right to disregard information or instructions provided by a Seller where such information or instruction is not confirmed by [FGM] in a timely manner, with or without request from Indigo." *Id.* at section entitled "Notices; Contract with Seller."

22.     The Master Agreement also requires FGM to "indemnify, defend, release and hold harmless Indigo and its affiliates, directors, officers, employees, agents and representatives, and those of its affiliates, for any loss, expenses, liabilities, claims or demands caused by [FGM's] breach of [FGM's] obligations, representations or warranties under the Master Agreement, this Annex and any Sale Agreement and under any transaction [FGM] entered into on the Indigo Marketplace." *Id.* at section entitled "Indemnification."

23.     The Master Agreement further provides that any dispute arising under the Master Agreement and not governed by the National Grain & Feed Association ("NGFA") trade rules "will be governed by the laws of the State of Tennessee, without reference to any conflict of laws rule. Any dispute arising under or relating to this Agreement or an Indigo Marketplace transaction that is not justiciable under the [NGFA] Rules must be brought in the state or federal courts in the State of Tennessee. [FGM] and Indigo irrevocably consent to personal jurisdiction in the State of Tennessee and service of process by registered U.S. Mail for any such dispute." *Id.* at section entitled "Miscellaneous."

24.     Thus, pursuant to the terms of the Master Agreement, as set forth above and incorporated by reference in Exhibit B, FGM is required to follow Indigo policies when carrying

out Agent Transactions, refrain from misusing its agency authority, and execute transactions accurately.

**Managed Pricing Program Agreements**

25.     On or about October 7, 2019, and continuing through the fall of 2020, Jeremey Frost entered into a series of Managed Pricing Program Agreements (each, an "MPP Agreement") with Indigo on behalf of his business, FGM, all to open various managed pricing programs under the same substantive terms and conditions.  *See* Ex. C (a sample MPP Agreement, dated March 30, 2020).  Each MPP Agreement provides that:

    a.    "Indigo operates a digital crop marketplace known as the Indigo Marketplace… under which [FGM] acts as a… GMA to growers who wish to engage in forward contract transactions for agricultural products on the Indigo Marketplace."  The MPP Agreement further provides that "Indigo offers a program known as Indigo Managed Pricing Program… pursuant to which Indigo, as buyer, offers a seller of crops on the Indigo Marketplace (a "Seller") forward contract pricing provisions whereby a Seller may establish the price of a forward contract based on a futures reference price in accordance with certain pricing programs."  *Id.* ¶ 2-3.

    b.    FGM agrees to refer Sellers to the Managed Pricing Program.  For those Sellers to be eligible for the Managed Pricing Program, the Sellers must "(i) be enrolled in Indigo Marketplace, (ii) enter into a binding forward contract transaction to sell crops on Indigo Marketplace (a "Transaction"), and (iii) return to Indigo a duly executed Managed Pricing Program Addendum, on the form established by Indigo, that allocates the crops subject to the Transaction to one of the Pricing Programs."  *Id.* at section entitled "Referrals to Pricing Program."

26.     With respect to pricing program operations, each MPP Agreement provides that:

    a.    "Indigo will have primary responsibility for setting the futures reference price for all Transactions."  *Id.* at section entitled "Operation of Pricing Programs."

    b.    FGM "will provide instructions on the volume, price and dates upon which a Seller desires to enter into a Transaction so that Indigo may set the futures reference price for each Pricing Program Transaction."  *Id.*

    c.    FGM "shall provide instructions for 100% of the volume committed to the Pricing Program" and that "Indigo agrees that it will not use the instructions for any purpose other than pricing unpaid physical grain that Sellers commit to deliver to Indigo

pursuant to unpriced forward contracts and the purposes contemplated under each Pricing Program." *Id.*

d.   "In using the instructions to set the futures reference price of Transactions, Indigo will comply with all applicable laws, rules, regulations and orders, including the rules and regulations of all applicable self-regulatory organizations." *Id.*

27.   By executing the MPP Agreement, FGM "warrants and agrees that it will comply with all applicable rules and laws, and that it will be [FGM's] sole responsibility to make any applicable disclosures as may be required regarding the referral relationship between Indigo and [FGM] under this Agreement to any Seller that it may refer to participate in a Pricing Program." *Id.* at section entitled "Disclosure, Compliance, and Limitations of Remedies."

28.   Furthermore, under the MPP Agreement, FGM is "required to make all necessary disclosures to Sellers regarding the Pricing Program and risk profiles associated with each Pricing Program." FGM additionally "represents and warrants to Indigo that any Seller participating in a Pricing Program will be, as of the time of enrollment, adequately informed by Participant of all risks associated with participation in the Pricing Program." *Id.*

29.   Beyond these representations and warranties, FGM also agreed it would "be responsible for the content of any marketing, updates or other communications sent to Sellers enrolled in a Pricing Program that relate to such Seller's participation in such Pricing Program." *Id.*

30.   FGM's obligation to inform sellers regarding the specifics of the Managed Pricing Program, and the specific risks attendant to transactions under that program, rested solely with FGM. Specifically, the MPP Agreement provided that "Indigo may, but is not required to, seek reasonable assurance of such compliance, but is under no circumstances responsible for ensuring such compliance." *Id.*

31.     Furthermore, FGM agrees in the MPP Agreement "to hold Indigo harmless and indemnify Indigo, including for any and all loss, expense, liabilities, claims, demands, and reasonable attorney fees and expenses (collectively, "Claims") caused by: (i) any breach or failure by [FGM] to comply with any provision of this Agreement; (ii) [FGM's] breach of the discharge of its duties, whether negligent, willful, or otherwise, owed to Seller including with respect but not limited to Participant's authority to enter into Transactions or potential transactions on behalf of Seller with Indigo or on the Indigo Marketplace; and (iii) any acts taken by Participant including but not limited to on a discretionary basis on behalf of Seller, or by Seller based on any advice provided by Participant to Seller." *Id.*

32.     The MPP Agreement further provides that "[e]xcept for the indemnity and hold harmless provisions of this Section, neither Party shall be responsible to the other for any lost profits, consequential or incidental damages of any kind." *Id.*

33.     The MPP Agreement imposed numerous additional restrictions and obligations upon FGM with respect to its relationship with Sellers under the MPP Agreement.  By executing the MPP Agreement, FGM expressly covenanted that:

   a.     FGM will advise its clients that "Seller and Indigo are entering into a forward contract as commercial counterparties only, and that by entering into a Pricing Program Transaction with Indigo: (i) Seller is not opening a futures / options account; (ii) Seller will not have a futures / option position; (iii) Indigo is not acting as a commodity trading advisor ("CTA"), a futures commission merchant ("FCM"), an introducing broker ("IB"), a commodity pool operator ("CPO"), or a swap dealer; and (v) the pricing provisions of any contract which Seller enters into on Indigo Marketplace is a forward contract pricing mechanism only, and is not a futures / option contract or a commodity pooling agreement.

   b.     Prior to referring a customer to become a Seller in the Indigo Marketplace, FGM will "disclose to the customer the nature of compensation or other economic interest… [FGM] is entitled to receive from Indigo with respect to such customer, that such compensation may constitute a material conflict of interest with respect to any advice [FGM] may provide to the customer to become a Seller on and enter

into a transaction in the Indigo Marketplace, and how [FGM] manages any such conflicts of interest in providing advice to their customers.

*Id.* at section entitled "Participation, Representations, Warranties, and Covenants."

34.     As with the aforementioned agreements, the MPP Agreement provided that FGM and Indigo agree "that the Parties hereto are independent contractors and are engaged in the conduct of their own respective businesses. Indigo is not to be considered an [agent] of [FGM], and [FGM] is not to be considered an agent of Indigo, for any purpose, and neither Party has the right or authority to enter into any contracts or assume any obligations for the other or to give any warranty to or make any representation on the other's behalf, except where and to the extent authorized specifically in writing to do so."  *Id.* at section entitled "Independent Parties."

**Grain Transaction Commitment Agreements**

35.     On May 22, 2020, Jeremey Frost entered into a Grain Transaction Commitment Agreement ("Commitment Agreement") with Indigo on behalf of his business, FGM.  *See* Ex. D (Grains Transaction Commitment Agreement, effective May 22, 2020).  Through that agreement, FGM committed to "source and sell to Indigo at least 30,000,000 bushels of crops for delivery through the 2022 crop year (the "Minimum Commitment")… In the event FGM fails to meet its Minimum Commitment, FGM shall pay to Indigo a per-bushel fee for any shortfall between the actual amount transacted and the Minimum Commitment of $0.0075 per bushel (the "Shortfall Fee")."  *Id.* at section entitled "Purchase and Sale of Crops."

36.     The Commitment Agreement is governed by the laws of Tennessee. "Any dispute arising under or relating to this Agreement must be brought in the state or federal courts located in Shelby County, Tennessee" and FGM "irrevocably consent[s] to personal jurisdiction in the State of Tennessee and service of process by registered U.S. mail for any such dispute."  *Id.* at section entitled "Dispute Resolution."

37.     The Commitment Agreement, like all other agreements before it, set forth that "[t]he relationship of each Party to the other is that of an independent contractor, and nothing in the Agreement is intended to, or shall be construed to, create a partnership, agency, joint venture, employment or similar relationship between the Parties hereto or any of their respective employees or agents… No Party is authorized to make any representation, contract or commitment on behalf of another Party unless specifically requested or authorized in writing to do so by the other Party." *Id.* at section entitled "Miscellaneous."

38.     The Commitment Agreement also provided that "Indigo shall have the right to offset any amounts owed to Indigo hereunder from any other payments otherwise due by Indigo to FGM under any other agreement between the Parties." *Id.*

39.     On June 1, 2020, Jeremey Frost entered into a Second Grain Transaction Commitment Agreement ("Second Commitment Agreement") with Indigo on behalf of his business, FGM, on substantially the same terms. *See* Ex. E (Second Commitment Agreement, effective June 1, 2020).   The Second Commitment Agreement committed FGM to source and sell to Indigo an additional 20,000,000 bushels of crops for delivery through the 2022 crop year (the "Minimum Commitment"). *Id.* at section entitled "Purchase and Sale of Crops."

40.     The Second Commitment Agreement provided that the "obligations set forth in the Grain Transaction Commitment Agreement dated May 22, 2020 previously entered into between the Parties (the "May Agreement") are in addition to, and not superseded by, the obligations set forth in this Agreement. FGM acknowledges and agrees that its execution of this Agreement and its obligations hereunder is in consideration of Indigo's prior agreement to provide an updated vesting schedule with respect to a warrant issued by Indigo's parent company to FGM, and FGM

acknowledges the sufficiency of such consideration for its obligations hereunder." *Id.* at section entitled "Previous Agreement."

## Marketplace Volume Incentive Agreement

41.     On August 25, 2020, Jeremey Frost entered into a Marketplace Volume Incentive Agreement ("Incentive Agreement") with Indigo on behalf of his business, FGM.   *See* Ex. F (Marketplace Volume Incentive Agreement, effective August 25, 2020).

42.     The Incentive Agreement provided that FGM "will refer its network of crop sellers ("Sellers") to sell crops to Indigo on Indigo Marketplace, and for which crop sale, they may utilize a Pricing Mechanism (referred to herein as Pricing Mechanisms, pricing tools and pricing products) with respect to binding transactions on the Indigo Marketplace (a "Transaction")." *Id.* at section entitled "Volume-based compensation for Crop Transaction related to Pricing Mechanisms."

43.     In order for FGM to be eligible for payment under this Agreement for any Transaction, "the Seller must: (i) Be on a mutually agreed-upon list of [FGM's] customers or referral accounts or otherwise is an account linked to [FGM]; (ii) Be enrolled in Marketplace; (iii) Enter into a binding transaction to sell crops to Indigo on Indigo Marketplace; and (iv) Use a Pricing Mechanism to establish the price with respect to such Transaction." *Id.*

44.     The Incentive Agreement contains the following provisions:

a.     FGM "covenants, warrants and agrees that it will comply with all applicable rules and laws, and that it will be [FGM's] sole responsibility to make any applicable disclosures as may be required regarding the referral relationship between Indigo and [FGM] under this Agreement to any Seller that it may refer to use a Pricing Mechanism. [FGM] will be responsible for making disclosures to Sellers of the fees that Indigo will charge Sellers that may be in excess of standard fees charged by Indigo.   *Id.* at section entitled "Disclosure, Compliance, and Limitations on Remedies."

b.   FGM "will be responsible for the content of any marketing, updates or other communications sent to growers to promote use of a Pricing Mechanism. Indigo may, but is not required to, seek reasonable assurance of such compliance, but is under no circumstances responsible for ensuring such compliance." *Id.*

c.   FGM "expressly acknowledges that any compensation for referral of its network of growers is based solely on the volume of grower transactions generated for forward contracts of crops on Indigo Marketplace and does not in any way relate to any services for commodities trading or opening of futures / options account for such growers. [FGM] is responsible for communicating any potential conflict of interest to its grower network based on this Agreement." *Id.*

45.     In the Incentive Agreement, FGM "agrees to hold Indigo harmless and indemnify Indigo for any failure to comply with [covenants, warranties, and agreements]. Except for the indemnity and hold harmless of this Section, neither Party shall be responsible to the other for any lost profits, consequential or incidental damages of any kind." *Id.*

46.     As with all prior agreements, "[e]ach of the Parties acknowledge and agree that the Parties hereto are independent contractors and are engaged in the conduct of their own respective businesses" and that "Indigo is not to be considered an agent of [FGM], and [FGM] is not to be considered an agent of Indigo, for any purpose, and neither Party has the right or authority to enter into any contracts or assume any obligations for the other or to give any warranty to or make any representation on the other's behalf, except where and to the extent authorized specifically in writing to do so." *Id.* at section entitled "Independent Parties."

47.     This Incentive Agreement "shall be governed by the laws of the State of Tennessee, without reference to any conflict of laws rule. Any dispute arising under or relating to this Agreement must be brought in the state or federal courts in the State of Tennessee. The Parties irrevocably consent to personal jurisdiction in the State of Tennessee and service of process by registered U.S. Mail for any such dispute." *Id.* at section entitled "Miscellaneous."

48.     The above contracts contain numerous other terms and conditions, and the specific allegations as to of certain terms and conditions is not meant to imply that other terms and conditions of the above-referenced contracts do not also apply.

### ALLEGATIONS

**A.      Indigo's Initial Correction of Defendants' Misstatements of Pricing Programs**

49.     Notwithstanding the repeated contract terms and covenants, as well as applicable policies and instructions, Defendants almost immediately began incorrectly describing Indigo's pricing programs as "options" or "futures."

50.     None of Indigo's pricing programs are options or futures, and all Indigo Marketplace transactions are forward contracts requiring physical delivery of the grain or commodity to which the transaction applies.

51.     Indigo became aware of such initial mis-descriptions, and Indigo corrected Defendants' descriptions of the pricing programs.

52.     Defendants are not authorized to act as Commodity Trading Advisors for any Marketplace transaction or any pricing advice relating to any Marketplace transaction.

53.     Both Defendants' contracts and Marketplace transaction documents disclose to Defendants and prospective sellers that Marketplace transactions are, and are intended to be, forward cash (or physical) grain contracts.

54.     Both Defendants' contracts and Marketplace transaction documents disclose to Defendants and prospective sellers that Indigo does not open and does not purport to open a futures/options account for sellers.

55.     Defendants' contracts warrant and represent that Defendants will disclose to sellers that Indigo is not and does not purport to be a Commodity Trading Advisor.

56.     Indigo reasonably believed, based upon the contracts and other communications, as well as Indigo's express corrections of Defendants' descriptions, that Defendants fully understood the correct description of Indigo's pricing programs, and that Defendants were complying with the same.

**B.     Unauthorized Transactions**

57.     On multiple occasions, including significant numbers of instances beginning in approximately August or September 2020, Defendants ignored contractual limitations as a Grain Marketing Advisor and committed Indigo to transactions without Indigo authorization.

58.     For example, in September 2020, Defendants purported to enter into a contract with a commodities buyer committing Indigo to buy and deliver to the commodities buyer substantial amounts of millet.

59.     Indigo did not in fact authorize the transaction, and Defendants' actions in purporting to enter into the transaction were expressly contrary to Defendants' contracts.

60.     After creating the contract, FGM refused to stand behind it, and Jeremey Frost claimed, with no evidence, that the contract should have been cancelled by the buyer. The commodities buyer took the position, supported by documentation, that it is an open contract. Indigo is currently in the process of trying to resolve the situation with the buyer, and is likely to incur a significant loss by either backfilling or cancelling the contract and has already suffered reputation damage with the commodities buyer.

61.     In another instance, around August 2020, Defendants purported to contract with an agribusiness company relating to sale of a specialty crop.

62.     Indigo did not in fact authorize the transaction, and Defendants' actions in purporting to enter into the transaction were expressly contrary to Defendants' contracts.

63.     The terms of the contract, particularly regarding transfer of title, were not possible for Indigo to agree to, based on the way Indigo operates its business, but by the time Indigo received the contract, it was too late to challenge the terms, causing a difficult scenario with the company.

64.     Around the time of this conduct by Defendants, and partly as an effect of said conduct upon information and belief, Indigo was made aware that the company was considering and may have enacted a temporary company-wide moratorium, causing Indigo substantial losses, including losses in Indigo business areas well beyond the commodity transactions on which Defendants worked, and reputational damage. As of the date of this Complaint, certain locations of this company still refuse to conduct business with Indigo.

65.     Nevertheless, Defendants continued this conduct. Representatives of the company were disturbed by Jeremey Frost's behavior and the potential risk to their reputation and business in entering contracts with Indigo based on the authority Frost alleged that he possessed. Said representatives made these concerns known to Indigo in October of 2020.

66.     On numerous occasions, Defendants fraudulently induced Indigo to enter into contracts as buyer of commodities based upon knowingly or recklessly false statements of fact regarding the existence or availability of grain that did not in fact exist or was not available for the contract described.

67.     For example, on or around October 2, 2020, an Indigo buyer account manager received a contract from an agricultural commodities buyer, totaling 1,960,000 pounds of re-cleaned millet alleged to have been contracted on Indigo's behalf by Defendants. Indigo immediately contacted Jeremey Frost to determine if he had grain sellers lined up to fill these contracts, and he assured Indigo that he did. In reliance on Defendants' representations and

authority, Indigo allowed the contracts to proceed.  Ultimately, Defendants have not designated sellers to cover 1,620,000 of the 1,960,000 pounds under contract. One of the sellers Defendants represented as being responsible for a portion of the contracts never agreed to this contract and in fact is not in the network of growers who will conduct business with Indigo.  Defendants continue to insist that growers are available for this contract but refuse to provide any information to date. Upon information and belief, Defendants had knowingly or recklessly represented the existence of the available millet crop and apparently lied about at least one of the grower's having granted authority to enter into the contract.

68.     Indigo continues to attempt to resolve this situation with the commodities buyer, though it appears Indigo will suffer a significant loss attempting to find backfills for this premium specialty grain or by being forced to cancel.

69.     In a separate instance, also on or around October 2, 2020, an Indigo buyer account manager received a contract from an agricultural commodities buyer, totaling 200,000 pounds of millet alleged to have been already contracted on Indigo's behalf by Defendants, with a delivery window of September 1, 2020 through October 31, 2020. Indigo contacted Jeremey Frost to determine if he had grain sellers lined up to fill these contracts, and he assured Indigo that he did, specifically naming an individual farmer as the seller.

70.     Indigo began to be concerned, as there were no deliveries occurring on this contract. Indigo requested multiple times for Defendants to communicate with the designated seller to determine the source of any issues and to schedule deliveries. On November 18, 2020, Jeremey Frost finally admitted that this grower may not be aware of the contract at all.  Indigo subsequently learned that the grower never agreed with Defendants on this contract. Upon information and

belief, Jeremey advised the grower to state that he called Indigo, and someone named "Tim" told him he did not have to deliver.  Indigo has reason to believe this assertion is false.

71.    Indigo will likely be required to cancel this overdue obligation at a significant financial loss and suffering reputational loss.

72.    These losses and reputational injuries are the direct result of Indigo's reliance on Defendants' misstatements.

73.    Before, during and after the above-described instances, Indigo repeatedly informed Defendants of Indigo's processes, guidelines, limits of authority and practices designed to limit or prevent such instances.

74.    Although Defendants repeatedly claimed to understand such instruction, in fact, Defendants' behavior does not appear to have actually changed.

75.    During this time, Defendants engaged in these and other practices in violation of Indigo's policies and procedures and in breach of the contracts described above.

**C.    Status of Defendants' Growers' Obligations and Pricing Strategies**

76.    Defendants have made significant use of Indigo's Managed Pricing Programs and other pricing tools on behalf of their growers with whom Defendants have an agency relationship.

77.    Indigo managed pricing programs allow growers to enroll portions of their crop production in marketing programs based on the grower's chosen advisor and strategy. These programs allow growers to benefit from hedging expertise, and are intended to hedge market price risk and maximize sales price for the physical grain at delivery.

78.    Indigo also offers other pricing products intended to allow growers to forward contract to create a strategic marketing portfolio, rather than be subjected solely to the market price at the time they are ready to deliver their grain.

79.    All Indigo managed pricing programs and other pricing products are forward contracts that are embedded in a physical grain delivery contract during the specified crop year.

80.    In the last several months, market conditions have adversely affected numerous of these growers referred or represented by Defendants, including causing some of these growers to have severe negative positions tied to their physical commodities based upon pricing strategies they have undertaken, as recommended by Defendants.

81.    Beginning in approximately October 2020, these adverse circumstances have caused growers to make unusual requests to Indigo to attempt to ameliorate the effects of the current markets, and to raise threats and allegations against Indigo.

82.    As Indigo delved more deeply into these developing issues, it became apparent that Defendants had not been communicating or correctly communicating with certain growers about the risks of their pricing strategies, about the adverse status of their pricing strategies, or about the values of their programs.

83.    As Indigo investigated further, other growers began to complain about pricing strategies recommended and implemented by Defendants.

84.    By the middle of November, it was clear that some combination of pricing strategies recommended and implemented by Defendants, and agreed to by those growers, were creating substantial risk for those growers and severely lessening the value of certain of their crops.

85.    In and around this timeframe, Defendants engaged in a deliberate effort to cover their own risks by lying to growers about the risks and obligations of their programs, lying about growers' rights under these programs, claiming that Defendants could exercise rights that did not exist in these programs or under contract terms, and generally attempting to blame Indigo for the growers' losses.

86.     Among other things, Defendants wrongfully returned to making knowingly false descriptions of Indigo's pricing programs and tools, incorrectly characterizing them as options or futures, and no-risk programs with unlimited swapping and rolling opportunities, thus informing growers – falsely – that growers could simply refuse to deliver grain or comply with contract terms.

87.     Defendants' actions in incorrectly describing Indigo's pricing programs as "options" or "futures" breached numerous of the above-described contracts.

88.     Indigo did not, in any manner, authorize Defendants to describe Indigo's pricing programs as "options," or "futures," and expressly prohibited such inaccurate descriptions.

89.     In addition, in and around November and/or December 2020, Defendants engaged in a deliberately false and defamatory campaign against Indigo, to wit, contacting, at least, growers who were parties to Indigo contracts to falsely state one or more of the following:

a.      That Indigo owed several millions of dollars to Defendants' customers;

b.      That Indigo was in violation of allegedly applicable rules or regulations;

c.      That Indigo had "changed the rules" of grower contracts impermissibly; and/or

d.      Other false and disreputable facts designed to disparage Indigo.

90.     On at least December 1, 2020, Defendants also sent a highly defamatory email to at least one grower with substantial contracts with Indigo, stating falsely that Indigo was or could be subject to a fraud claim or Ponzi scheme claim, and indicating a strategy of coordinating growers to publicly repudiate their contracts with Indigo to Indigo's buyer counter-parties.

91.     The email was sent via Jeremey Frost's typical business email, which is actually an email owned and provided for use to Jeremey Frost by Reliance Capital Markets II, LLC, d/b/a RCM Alternatives, with domain rcmam.com.  Upon information and belief, an unknown number of persons at RCM Alternatives have improper access to Defendants' Indigo Confidential

Information, as well as access and receipt of the defamatory content. Fearless Grain Marketing is listed as an alias, and Jeremey Frost is listed as an Associated Person Registered, of Reliance Capital Markets II, LLC with the National Futures Association.

92.     A second email to two growers with substantial contracts with Indigo included Indigo Confidential Information shared with Defendants in confidence previously for the purpose of developing their business arrangements but disclosed by Defendants in this instance to attempt to make Indigo look bad in front of its customers.

93.     Indigo took (and takes) the growers' concerns seriously, but as Indigo reached out to growers, Indigo discovered that Defendants' defamatory campaign was having its desired effect: many growers were reluctant to talk to Indigo, or expressed distrust or misunderstanding about their contract terms and Indigo's role as a cause of their claimed problems.

94.     Growers threatened to, and in some cases did, default on contracts, as a result of Defendants' wrongful conduct, with the defaults damaging Indigo and potentially costing Indigo substantial sums. Other threats remain pending, as Indigo currently undertakes good faith attempts to work them out.

95.     By this point, Indigo was forced to withhold monies from Defendants in setoff for breaches of contract and indemnity amounts owed under the contracts with Indigo.

96.     However, in good faith, Indigo sought to resolve these matters by including Defendants.  In December, Indigo and Defendants developed a proposed plan, and on December 30, 2020, Defendants signed an enforceable Memorandum of Understanding whereby the parties exchanged consideration.  Ex. G (Memorandum of Understanding, effective December 30, 2020).

97.     In exchange for FGM's commitment, "Indigo agree[d] to immediately initiate the wire transfer process to release to Fearless $220,491.27 . . . upon Fearless' signature hereto and

submission of proof of sending the aforementioned correspondence." FGM further agreed to, in relevant part:

a. Issue specifically agreed upon emails to growers correcting certain of Defendants' misstatements or potential misstatements regarding those growers' contract terms with Indigo,

b. Cease discouraging growers from attempting to resolve issues involving Indigo,

c. Refrain from any disparagement of Indigo,

d. Acknowledge the cancellation or close out of the Programs or of [FGM's] role in the Programs;

e. Keep all issues arising from the Contracts, all settlement negotiations (including the existence and contents of the Memorandum), and all terms of any eventual settlement strictly confidential;

f. Not publicize Indigo's internal information or any Indigo communications without Indigo's explicit, written permission; and

g. Abide by all confidentiality obligations, including those agreed to as part of its Indigo Grain Marketing Advisor Agreement, dated May 1, 2019.

98. Shortly after executing the MOU Agreement, Indigo took steps to wire $220,491.27 to Defendants in full compliance with the express terms of the MOU Agreement.

99. Upon information and belief, Defendants issued the corrective emails, and in reliance on the further promises of the Memorandum of Understanding, Indigo released the agreed upon funds.

100. Unbeknownst to Indigo, however, at the time Defendants signed the Memorandum of Understanding, Defendants never had any intention of complying with the terms of the Memorandum of Understanding.

101. As an example, on or around January 13, 2021, Jeremey Frost jointly called a grower with Indigo to discuss the depressed values in the growers managed pricing programs, and Frost continued to state the same lies he stated prior to the Memorandum of Understanding about

Indigo changing rules and the grower having a right to refuse to deliver under his contracts, and Frost further insinuated that the grower would be justified in breaching his contracts with Indigo.

102.     As part of the Memorandum of Understanding, the parties agreed to work together toward a full and final settlement of the issues between them. In this effort, Indigo spent three weeks diligently working on an initial draft of an expansive agreement covering settlement, the parties' future business relationship, resolution of issues with Defendants' client-growers, and more. Defendants were consistently kept apprised of this progress.

103.     However, after the funds were released to Defendants, and hours before Indigo was scheduled to provide Defendants with a first draft of the proposed agreement, on January 19, 2021, Defendants sent to Indigo a letter with a remarkable string of false and baseless statements about Indigo, including but not limited to:

    a.    That tens of millions of dollars of transactions to which Indigo was a party were either immediately due or due with a few days' time,

    b.    That dozens and dozens of FGM invoices are overdue, based allegedly on FGM being a broker for Indigo, which it nor Jeremey Frost have ever been,

    c.    That Indigo is creating "phantom demand," and

    d.    That a slew of individual contracts were short paid or still due in some specific amount, totaling an additional $50 million dollars.

104.     The detail of Defendants' letter also included more than one hundred Indigo internal transaction numbers, alleged amounts claimed aggregated from those transactions, and numerous specific transactions and specific amounts for those individual transactions, all in violation of confidential obligations of the contracts at issue in this case.

105.     Indigo determined, and Jeremey Frost has since admitted, that while the letter is addressed to Indigo, Defendants actually delivered the letter to an undisclosed list of recipients,

using the same rcmam.com email server, including, upon information and belief, at least growers

with existing Indigo contracts and a GMA relationship with Defendants.

106.    Upon information and belief, Defendants' dissemination of the letter to such

growers was designed to, and did, spread to those growers false and libelous information about

Indigo with the intent that such growers would determine to, among other things:

    a.    Further spread such misinformation,

    b.    Cease doing business with Indigo, and

    c.    Breach existing contracts with Indigo, the terms of which are fully known to Defendants.

107.    On January 20, 2021, at 7:03 a.m., an unknown recipient of the jfrost@rcmam.com

defamatory email, going by the alias "ImTheBoss," posted the defamatory letter, in full, on the

website newagtalk.com.  The post remained on the website for approximately the full business

day, generating comments, including comments negative to Indigo. The posting was seen,

distributed, and discussed extensively.

108.    On January 20, 2021, Defendants sent another letter to Indigo and an undisclosed

list of recipients, using the same rcmam.com email server, including, upon information and belief,

at least growers with existing Indigo contracts and a GMA relationship with Defendants.

109.    This second letter contained additional false and defamatory statements about

Indigo, including but not limited to false and baseless statements that:

    a.    Indigo is in violation of NGFA rules or other regulations,

    b.    Indigo is "not performing to industry standards, nor having contracts,"

    c.    Indigo is "fluffing numbers via misleading practices,"

    d.    Indigo "is constantly taking implied positions and does not realize it most of the time,"

e.      Indigo is "altering contracts," and

f.      FGM has been "blackmailed" and "bribed."

110.    The second letter provided the jfrost@rcmam.com email as a contact for Frost.

111.    On January 20, 2021, Indigo sent Defendants a cease and desist letter, demanding,

in relevant part, that Defendants do the following:

> Indigo hereby demands that you:
>
> (1)     Identify to Indigo all persons to whom you have disseminated either or both letters,
>
> (2)     Retrieve the letters from any and all dissemination other than to Indigo,
>
> (3)     Acknowledge that the letters contain propriety and confidential information that should not have been disseminated,
>
> (4)     Make a corrective statement to any such recipients to the simple effect that Indigo disputes the contents of your letters, and
>
> (5)     Cease and desist from any further dissemination of the letters or any other dissemination of libelous, slanderous, proprietary or confidential information.
>
> In addition, it has come to our attention that at least the first of your letters was posted onto the AgTalk forum by an unknown person or entity using the name "ImTheBoss."  Indigo demands that you:
>
> (1)     Immediately instruct AgTalk that you are the author of the letter(s) and the letter(s) is/are not appropriate for public posting on the AgTalk forum, and take any and all necessary action to cause AgTalk to remove the letters and any related thread immediately,
>
> (2)     Immediately instruct any and all recipients of your letter(s) that the letter(s) may not be posted to any public forum,
>
> (3)     Identify the person known on the AgTalk forum as "ImTheBoss" and provide that person's contact information to Indigo or, if you do not know that person's identity, confirm to Indigo that you do not know that person's identity, and

(4)     Cease and desist from any further action that would, or would cause, either of your letters or any similar libelous, proprietary or confidential information to be disseminated or posted on a public forum.

112.    On January 21, 2021, Defendants reported to Indigo that they had caused the ImTheBoss post to be removed, but did not comply, and in facts refused to comply, with any other demand.

**D.     Indigo's Injury**

113.    The above actions, constitute breach of contract, business defamation, and other tortious conduct in at least the following ways:

114.    Defendants failed to accurately describe the terms of pricing programs and/or contract terms to certain growers.

115.    Defendants failed to describe the details and risks of its own pricing strategies and advice to certain growers, or otherwise worked with certain growers to employ pricing strategies causing grower losses for which Defendants falsely now blame Indigo.

116.    Defendants abused their positions to purport to enter Indigo into contracts without Indigo's authorization or permission, or misled Indigo as to the terms of contracts or availability and existence of grain to which the contract referred, for their own gain, and in order to purport to apply contract amounts to volume commitments and/or satisfy other contract terms.

117.    As certain pricing terms based upon Defendants' and/or growers' pricing strategies were adversely affected by market conditions, Defendants failed to keep certain growers apprised of the status of such pricing programs, or to take other appropriate action, with or without certain growers' knowledge, understanding and agreement.

118.    As certain pricing terms based upon Defendants' and/or growers' pricing strategies were adversely affected by market conditions, Defendants instead engaged in a campaign of false

and defamatory communications with such growers and others deliberately and/or recklessly attempting to blame Indigo for Defendants' own failings and/or certain growers' own pricing strategies.

119.    Defendants breached confidentiality provisions by using the RCM Alternatives email server to send and receive confidential information to growers and unknown others not pertaining specifically to that grower or otherwise.

120.    Defendants either recklessly or deliberately delivered confidential, false and defamatory information to unknown third parties with either the intention that such third parties would further improperly post such information, or reckless indifference to the likelihood that such unknown third parties would further disseminate such information.

121.    Defendants, with full knowledge of the terms of existing grower contracts between growers and Indigo, intentionally lied and misstated the terms of those contracts, and otherwise lied to growers about rights to cancel or terminate such contracts, and Indigo's actions with regard to such contracts, in order to induce such growers to breach such contracts, and did in fact cause growers to breach such contracts.

122.    Defendants, with knowledge of Indigo's business relationships with other agricultural industry stakeholders, did spread false and misleading information to third parties and the public, resulting in certain such stakeholders decreasing, terminating, or ceasing such ongoing and prospective business relations.

123.    Defendants actions in these regards were intentionally designed to injure Indigo, in that Defendants made threats and spread false information, expressly encouraging individuals not to do business with Indigo, and to default on existing contracts.

124.     Upon information and belief, Defendants actively encouraged growers to avoid talking to Indigo, and/or to take positions contrary to contract terms, even as Indigo was attempting to resolve ongoing grower concerns, causing additional reputational harm and losses.

125.     Defendants engaged discussions with Indigo in bad faith, and entered into an enforceable contract with no intention to undertake the acts promised in that Memorandum of Understanding.  Subsequent actions by Defendants have robbed Indigo of all benefit of the bargain of that Memorandum of Understanding, even while Defendants keep amounts delivered to them under that agreement.

126.     Defendants continue to disseminate false and defamatory information about Indigo, and have refused to apprise Indigo of the extent of such actions, or take corrective action to fully remedy the behavior.

127.     As a result of Defendants wrongful conduct as fully set forth above in this Complaint, Indigo has suffered the following injuries and damages:

    a.     Causing the unwinding of transactions due to Defendants' wrongdoing, in amounts to be determined at trial, but exceeding $75,000, exclusive of costs, disbursements or fees and currently estimated to exceed $8,000,000;

    b.     Causing losses on contracts entered into on Indigo's behalf or based upon false assurances, in amounts to be proven at trial but currently estimated to exceed $500,000.00.

    c.     Causing contract losses in ongoing amounts to be proven at trial, but currently estimated to be at least several million dollars;

    d.     Causing growers to wrongfully default on contract obligations in ongoing amounts to be proven at trial, but currently estimated to be several million dollars;

    e.     Causing injury and damage to Indigo's goodwill and business reputation with existing and potential customers as well as other agricultural industry business partners and potential business partners, and causing such customers and business partners to breach, forego, or otherwise reject business opportunities with Indigo, in amounts to proven at trial, but currently estimated to be several million dollars;

f.     Causing costs and other increased risks of liability to Indigo as growers and other third parties act against Indigo based upon the false and/or misleading information provided by Defendants, or other wrongdoing and breaches by Defendants, including but not limited to the increased business and legal costs in defending Indigo against claims and inquires, and attempting to repair damage to goodwill and reputation of Indigo caused by Defendants' actions; and

g.     Other damages as may be determined in discovery and proceedings in this matter.

128.    In addition to Defendants' direct responsibility for such damages, Defendants are required to indemnify and hold harmless Indigo against such damages caused by Defendants wrongdoing and breaches of contract.

## CAUSES OF ACTION

### COUNT ONE – BREACH OF CONTRACT

129.    Indigo realleges each and every of the above paragraphs as though fully set forth herein.

130.    As detailed above, FGM entered into valid binding contracts, signed by Frost, with Indigo supported by offer, acceptance, and consideration.

131.    FGM acted by and through its principal, Frost, in the performance, and wrongful performance, of these contracts.

132.    The contracts include the Marketing Advisor Agreement, the Master Agreement, the Managed Pricing Program Agreements, the Commitment Agreements, the Incentive Agreement, and the Memorandum of Understanding ("MOU Agreement").

133.    The Marketing Advisory Agreement required FGM to maintain the confidentiality of Indigo's Confidential Information. This Confidential Information included:

"any sensitive or proprietary information provided by Indigo or any of its affiliates or representatives relating to Indigo or its business, its products or proposed products, Indigo Marketplace, the Indigo Products or this Agreement, that is provided either directly or indirectly, whether by demonstration or in graphic, written, electronic, oral or other form, and whether or not such information is labeled as "Confidential", "Proprietary" or any

other similar designation. "Indigo Confidential Information" shall include, but is not limited to, Indigo's technology, data, chemical structures, sequence information, know-how, techniques, chemical processes, biological process, analytical processes, materials, products, software, strategic business plans and objectives, product research and development plans, commercialization plans, markets, customers, inventions, technology, designs, marketing, trade secrets, patents, patent applications, copyrights, know- how, ideas, inventions (whether patentable or not), formulas, computer programs, databases, technical drawings, designs, algorithms, technology, circuits, layouts, interfaces, schematics, names and expertise of employees and consultants, any other technical, business, financial (including capitalization) customer development plans, supplier information, forecasts, and strategies."

134.    The MOU Agreement expressly reiterated and reinforced Defendants' existing binding confidentiality obligations, and imposed the additional confidentiality obligation to "keep all issues arising from the Contracts, all settlement negotiations (including the existence and contents of this Memorandum), and all terms of any eventual settlement strictly confidential." Defendants also agreed to not disclose "Indigo's internal information or any Indigo communications without Indigo's explicit, written permission."

135.    Defendants breached confidentiality obligations as fully set forth above.

136.    The MOU Agreement additionally contained an enforceable non-disparagement clause. Jeremey Frost, acting through his company FGM, breached that non-disparagement obligation multiple times, including without limitation when he communicated with a customer on January 13, 2021, and broadly distributed, or caused to be broadly distributed, the January 19, 2021  correspondence, in each instance falsely claiming that Indigo is responsible for the losses he caused to occur under the Managed Pricing Programs by advising his clients to enter into reckless short positions on the commodities they grow.

137.    Defendants have breached this non-disparagement obligation in communications to his client growers, among potential others as more fully set forth above.

138.    Numerous contracts entered into between Defendants and Indigo expressly require Defendants to communicate to his grower clients that Indigo does not offer options, futures, swaps, or other related hedging or derivative products through its Managed Price Program.

139.    Defendants failed to inform their customer clients that Indigo does not offer options, futures, swaps, or other related hedging or derivative products through its Managed Price Program, or that the positions Defendants executed on behalf of those clients did not involve any of the aforementioned financial instruments.

140.    Upon information and belief, Defendants informed FGM's clients that the contracts it entered into on their behalf constituted "option" contracts, or other risk management tools that are well outside of industry standards and that Indigo does not provide to growers through its Indigo Marketplace.

141.    By failing to notify its grower clients that Indigo does not offer options, futures, swaps, or other related hedging or derivative products through its Managed Price Program and other pricing products, and by affirmatively stating to them that FGM has placed them into options or futures positions, Defendants breached numerous contractual obligations to Indigo.

142.    Numerous contracts entered into between Defendants and Indigo expressly require Defendants to communicate the details and risks of advice provided by Defendants regarding pricing programs and to refrain from purporting to authorize transactions on Indigo's behalf.

143.    Defendants' conduct above constitutes breach of the express provisions of these contracts with Indigo, as well as a breach of its duty of good faith and fair dealing with respect to the above referenced contracts.

144.    As a direct and proximate result of these breaches, Indigo has sustained damages in an amount to be proven at trial, but in no event less than $75,000 dollars exclusive of attorneys' fees and costs.

## COUNT TWO – INDEMNIFICATION

145.    Indigo realleges each and every of the above paragraphs as though fully set forth herein.

146.    The Master Agreement requires FGM to "indemnify, defend, release and hold harmless Indigo and its affiliates, directors, officers, employees, agents and representatives, and those of its affiliates, for any loss, expenses, liabilities, claims or demands caused by [FGM's] breach of [FGM's] obligations, representations or warranties under the Master Agreement, this Annex and any Sale Agreement and under any transaction [FGM] entered into on the Indigo Marketplace."

147.    The MPP Agreement requires FGM "to hold Indigo harmless and indemnify Indigo, including for any and all loss, expense, liabilities, claims, demands, and reasonable attorney fees and expenses (collectively, "Claims") caused by: (i) any breach or failure by [FGM] to comply with any provision of this Agreement; (ii) [FGM's] breach of the discharge of its duties, whether negligent, willful, or otherwise, owed to Seller including with respect but not limited to Participant's authority to enter into Transactions or potential transactions on behalf of Seller with Indigo or on the Indigo Marketplace; and (iii) any acts taken by Participant including but not limited to on a discretionary basis on behalf of Seller, or by Seller based on any advice provided by Participant to Seller."

148.    The Incentive Agreement requires FGM "to hold Indigo harmless and indemnify Indigo for any failure to comply with [covenants, warranties, and agreements]. Except for the

indemnity and hold harmless of this Section, neither Party shall be responsible to the other for any lost profits, consequential or incidental damages of any kind."

149.    Pursuant to each of these agreements, Indigo is entitled to indemnity from FGM for any and all damages incurred by Indigo on account of Defendants' breaches of these agreements and/or the action or inaction described in the indemnity clauses, including without limitation losses incurred from Marketplace transactions and losses incurred from Managed Pricing Programs arising from Defendants' conduct or advice.

150.    Such damages also include but are not limited to, the costs and legal fees incurred in defending those actions, the costs and fees incurred by Indigo to bring the instant action, the costs and fees incurred by Indigo to defend against other potential legal actions or other proceedings arising out of Defendants' wrongful conduct.

**COUNT THREE – INTENTIONAL INDUCEMENT OF BREACH OF CONTRACT**

151.    Indigo realleges each and every of the above paragraphs as though fully set forth herein.

152.    Indigo entered into various valid and binding contracts with growers.

153.    Defendants were and are fully aware of these contracts and the terms thereof.

154.    In effort to shift blame from FGM to Indigo for the reckless short positions that FGM counseled its grower clients to enter into through the Indigo Marketplace, Defendants, on information and belief, instructed grower clients to breach their outstanding forward contracts with Indigo, and supported those instructions with false and defamatory statements of fact, or otherwise misleading statements about Indigo and the contracts.

155.    On information and belief, Defendants acted deliberately and/or with malice in directing growers to breach contracts with Indigo.

156.   The breaches of those contracts are the result of the Defendants' conduct.

157.   The breaches injured Indigo by depriving Indigo of the grain that it is entitled to pursuant to the terms of those contracts, and causing damages for the growers' non-performance.

158.   Defendants' actions to tortiously interfere with Indigo's contracts constitute a violation of Tenn. Code Ann. § 47-50-109, as well as comparable statutes governing such conduct and obligations under the common law.

## COUNT FOUR – INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONSHIPS

159.   Indigo realleges each and every of the above paragraphs as though fully set forth herein.

160.   Indigo maintained existing business relationships with agricultural commodity buyers, cooperatives, growers and other agricultural industry partners and had prospective relationships with those individuals and entities for purchase and sale of grain, as well as other services and products offered by Indigo.

161.   Defendants are aware of those relationships and prospective relationships through the grower network that they operate, and based on their interactions with Indigo's business partners.

162.   On information and belief, Defendants intended to cause the breach or termination of Indigo's business relationships when it transmitted correspondence to its grower clients accusing Indigo of causing them to lose vast sums of money through its Managed Pricing Program and otherwise through its grain Marketplace.  This intent is demonstrated in express threats to Indigo to cause defections and terminations of Indigo's business relationships.

163.    Indigo suffered damages from Defendants' tortious interference, in the form of lost revenue from terminated customer relationships or the loss of opportunity to secure future client relationships.

## COUNT FIVE – FRAUD

164.    Indigo realleges each and every of the above paragraphs as though fully set forth herein.

165.    Defendants communicated to Indigo its commitment to honor its obligations under the MOU Agreement – including its obligation to abide by confidentiality agreements, the non-disparagement agreement, and its agreement to negotiate the terms of settlement in good faith – in order to secure $220,491.27 that Defendants were not entitled to due to its prior breaches of contract.

166.    Defendants violated each of these commitments.

167.    Based on the nature of the promises, the close proximity in time of the repudiation of these promises, and Defendants' own false assertions that Defendants were "blackmailed" into making the promises, upon information and belief, Defendants had no intention to comply with their own promises at the time they were made on December 30, 2020.

168.    Defendants communicated these false statements with the intent to induce Indigo's reliance, thereby convincing Indigo to provide immediate payment of $220,491.27, and forestalling other corrective action by Indigo.

169.    Indigo relied upon Defendants' commitments to not disclose Indigo's confidential information, not disparage Indigo, and negotiate a settlement agreement in good faith. Had Indigo been aware that Defendants did not intent to honor these commitments, Indigo would neither have entered into the MOU nor paid Defendants the $220,491.27 payment.

170.    Indigo was injured as a result of its reliance on Defendants' communications, including by paying $220,491.27 to Defendants, forestalling other action, and by incurring reputational damages from Defendants' breach of its confidentiality and non-disparagement obligations.

171.    Indigo was additionally defrauded by Defendants as more fully described above where Defendants induced Indigo to enter into contracts by misrepresenting to Indigo the material facts of grower contracts and commitments and misrepresenting the existence of such grain or the ability to supply such grain, or Defendants' authority to enter into such transactions on behalf of the growers.

172.    When Defendants communicated these purported contractual commitments, supposedly made on behalf of its grower clients, Defendants were aware that they had not obtained prior authorization from growers, that the grain did not exist for sale to Indigo, or that it had misstated contract terms as compared to the terms described to growers.

173.    Defendants intended for Indigo to rely upon these false statements in the effort to consummate the transactions, potentially resulting in additional compensation for Defendants while placing all of the risk and ultimate losses on Indigo.

174.    Indigo was reasonable to rely upon Defendants' statement that its client growers had authorized Defendants to enter into the purported transactions, because Defendants had represented to Indigo that its clients had authorized it to enter into those contracts on each grower's behalf.

175.    Indigo was injured by Defendants' false statement concerning the transactions, because Indigo was required to cover those obligation through other means, at significant cost to the company.

176.     Absent those false statements by Defendants, Indigo would not have incurred injury from those purported transactions.

## COUNT SIX – DEFAMATION

177.     Indigo realleges each and every of the above paragraphs as though fully set forth herein.

178.     As fully detailed above, Defendants have published and caused to be published false and per se defamatory statements of fact about Indigo relating to Indigo's business and operations.

179.     At the time Defendants published and caused to be published these false and per se defamatory statements, Defendants knew such statements were false, or alternatively published such statements with reckless disregard for the truth of such statements.

180.     As a direct result of Defendants' actions, growers have defaulted on Indigo contracts, Indigo business partners have ceased or reduced business relationships with Indigo, and its Marketplace platform has suffered reputational injury.

## COUNT SEVEN – DECLARATORY JUDGMENT

181.     Indigo realleges each and every of the above paragraphs as though fully set forth herein.

182.     On April 9, 2021, Indigo received from the National Grain and Feed Association ("NGFA") a Notice of Claim enclosing an NGFA Arbitration Complaint Form on behalf of FGM.

183.     The original Complaint Form allegedly identified "[r]oughly 8.5 million" in damages by FGM against Indigo.

184.     The original Complaint Form described an alleged nature of the dispute as "Indigo has [allegedly] failed to pay brokerage dispite [sic] seller's commodity shipped and/or Indigo Ag

closed the contracts.  They have failed to comply with NFGA [sic] trade rules, even though, I spent hours and hours to explain the rules and critical nature of adherence.  More document will follow at proceedings."

185.    No contracts or contract numbers were provided in the Complaint Form, and despite the fact that the Complaint Form indicates that a copy of the contract is attached, no contract was attached.

186.    Indigo received FGM's first written submission (i.e., argument) of its claim on August 13, 2021.

187.    In FGM's first written submission of its claim, FGM specified for the first time that the basis for its alleged action before the NGFA was the same Master Agreement at issue in this litigation.  FGM claimed to the NGFA, through the same counsel of record in this case, that its claims were subject to arbitration because the Master Agreement allegedly provides "that 'any dispute directly relating to an Indigo Marketplace transaction will be referred to NGFA Arbitration in accordance with the rules'" and allegedly "the 'sole forum for resolution of all disagreements or disputes relating to Indigo Marketplace shall be arbitration proceedings before NGFA pursuant to the Rules.'"

188.    Consistent with the position taken by Indigo in its opposition to the then-pending (and under advisement) motion to dismiss and compel arbitration, Indigo informed FGM that the claims actually then-described in its first written submission were not arbitrable, and requested that FGM agree to stay its claims pending the outcome of the Court's ruling on FGM's and Frost's motion to dismiss and to compel arbitration.  FGM refused to agree.

189.    Because the ruling on the motion to dismiss was still pending, and in order to avoid any semblance of default, Indigo responded via an Answer to FGM's claims in the NGFA forum on October 8, 2021, the last day permitted by the rules and available extensions, arguing:

      a.   NGFA does not have the authority to determine the arbitrability of FGM's claims brought pursuant to the Master Agreement;

      b.   NGFA does not have the authority to arbitrate FGM's claims, in whole or in part, for the same reasons then currently at issue in the Court's consideration of the pending motion to dismiss;

      c.   Only in the alternative, and in order to preserve its rights, that FGM take nothing from its claims based on lack of legal and factual merit; and

      d.   That Indigo reserved its rights regarding counterclaims pending the outcome of the Court's ruling on FGM's and Frost's motion to dismiss.

190.    On October 20, 2021, the Court ordered FGM's and Frost's motion to dismiss and compel arbitration held in abeyance pending trial as to arbitrability, consistent with that order. (Doc. 40).

191.    On November 22, 2021, Indigo received from the NGFA FGM's reply submission in the arbitration.  The reply submission did not inform the NGFA that the Court had ruled, as of October 20, 2021, that a triable issue existed as to the meaning and application of the arbitration provisions of the Master Agreement.

192.    Instead, the FGM reply submission claimed that the Master Agreement required arbitration of FGM's claims.

193.    Flatly contrary to law and the Court's October 20, 2021 ruling, FGM claimed that the NGFA was permitted to determine substantive arbitrability of the claims before it over Indigo's objection.

194.    On December 6, 2021, Indigo orally requested through counsel that FGM agree to stay its arbitration proceedings pending the Court-ordered trial as to arbitrability.  On December 10, 2021, FGM through counsel refused that request.

195.    On December 20, 2021, Indigo sent FGM a formal demand indicating that as a matter of law, issues of substantive arbitrability are for the Court, not the NGFA, and again requesting that FGM consent to stay the NGFA proceedings pending the outcome of the trial as to arbitrability.  On December 22, 2021, FGM again declined.

196.    Both as a matter of the Court's October 20, 2021 ruling, and as a matter of law and precedent, issues of substantive arbitrability are for the Court, and not the NGFA.

197.    FGM's attempted insistence that the NGFA proceed to determine its own issues of substantive arbitrability are contrary to the contracts, law, and the Court's October 20, 2021 order.

198.    A justiciable controversy exists between the parties as to whether FGM's claims before the NGFA are arbitrable, and whether the NGFA has any authority to determine substantive arbitrability for itself.

199.    Moreover, under NGFA procedure, the arbitration Panel for any matter is not actually appointed until after the submission of all materials, and in the ordinary course, NGFA rulings are issued on the papers.

200.    There is, therefore, no procedure, or even decision-maker necessarily available from whom to seek relief (even were such appropriate before the NGFA), and the potential exists that absent agreement by FGM, or intervention by this Court, the NGFA would determine either

issues of arbitrability, or non-arbitrable claims, contrary to law, and to the irreparable harm of Indigo.

201.     Indigo is entitled to a declaratory judgment (1) that FGM is not entitled to have the NGFA determine its own alleged substantive arbitrability as to FGM's alleged claims in arbitration, and (2) that FGM's alleged claims in arbitration are not arbitrable, in whole or in part, for the same or similar reasons already before the Court for trial as to FGM's and Frost's motion to compel arbitration.

**WHEREFORE,** Indigo prays that:

1.      A judgment is entered in favor of Indigo and against Defendants for breach of contract and for damages in an amount to be proven at trial, but not less than $75,000, exclusive of costs, disbursements, interest, and fees, and potentially exceeding $8,000,000;

2.      A judgment is entered in favor of Indigo and against Defendants for indemnity of any and all amounts suffered, incurred, or awarded against Indigo based upon Defendants' wrongful conduct and breaches of contract, in an amount to be proven at trial;

3.      A judgment is entered in favor of Indigo and against Defendants for intentional inducement of breach of contract and for damages in an amount to be proven at trial;

4.      A judgment is entered in favor of Indigo and against Defendants for intentional interference with business relationships and for damages in an amount to be proven at trial;

5.      A judgment is entered in favor of Indigo and against Defendants for fraud and for damages in an amount to be proven at trial;

6.      A judgment is entered in favor of Indigo and against Defendants for defamation and for damages in an amount to be proven at trial;

7.      An order granting permanent injunctive relief enjoining Defendants from future breaches of its confidentiality and non-disparagement obligations, as well as enjoining Defendants from defaming Indigo in the future;

8.      An order declaring that FGM's alleged claims in arbitration are not arbitrable, in whole or in part, and that FGM is not entitled to have NGFA determine issues of substantive arbitrability;

9.      An order granting such injunctive relief as is appropriate enjoining FGM from proceeding in arbitration and staying the arbitration during the pendency of the Court's determination of issues of arbitrability, as well as such other relief as may be appropriate in light of the Court's determination;

10.      An order that Indigo is awarded its reasonable attorneys' fees, consulting fees and other litigation expenses;

11.      The award of pre- and post-judgment interest as permitted by law;

12.      An order that Indigo is awarded such other further relief as this Court deems proper.


Respectfully submitted,

BUTLER SNOW LLP

By:  /s/ Kathryn K. Van Namen
     Kathryn K. Van Namen (TN #31322)
     6075 Poplar Avenue, Suite 500
     Memphis, Tennessee 38119
     Telephone: (901) 680-7200
     Facsimile: (901) 680-7201
     Kate.VanNamen@butlersnow.com

DORSEY & WHITNEY LLP

Daniel J. Brown (MN #0298992)
(subject to *pro hac vice* admission)

brown.daniel@dorsey.com
Jack Huerter (MN #0399277)
(subject to *pro hac vice* admission)
huerter.jack@dorsey.com
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402-1498
Telephone:  (612) 492-6653

INDIGO AG, INC.

Adam Lazarov (TN #033158)
alazarov@indigoag.com
50 S B.B. King Blvd
Memphis, TN 38103

*Counsel for Indigo Ag Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on April 6, 2022 a copy of the foregoing document has been filed electronically.  Notice of this filing will be served by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  All other parties will be served via first-class United States Mail, postage prepaid.  Parties may access this filing through the Court's electronic filing system.

/s/ Kathryn K. Van Namen

63840966.v1